POLLARD et al., Appellants,

v.

HUNT, Appellee.

Ohio Bar Liability Insurance Company, Appellee,

v.

Hunt et al., Appellants.

[Cite as *Pollard v. Hunt,* 164 Ohio App.3d 353, 2005-Ohio-5962.]

Court of Appeals of Ohio,
Second District, Montgomery County.

Nos. 20876 and 20981.

Decided Nov. 10, 2005.

Robert R. Furnier, Judi Sobecki, and Scott R. Thomas, for appellants.

Neil F. Freund, Wayne E. Waite, and Vaseem S. Hadi, for appellee Ohio Bar Liability Insurance Company.

John A. Smalley, for appellee Richard M. Hunt.

———————

WOLFF, Judge.

{¶ 1} Drucilla Pollard, Robert Stamm, and their daughter, Tammi Stamm (collectively, "the Pollards") appeal from a judgment of the Montgomery County Court of Common Pleas that granted judgment to Ohio Bar Liability Insurance Company ("OBLIC") on the Pollards' claim for coverage.

{¶ 2} According to the record, the Pollards hired attorney Richard Hunt to represent them concerning their daughter's personal-injury and negligence claims arising out of an automobile accident. Hunt filed an action for the Pollards against Domino's Pizza, Inc., and others as part of his representation. *Pollard v. Maus*, Warren Case No. 93–CV–51465. On May 10, 1994, the court granted summary judgment to Domino's. Although the ruling contained a Civ.R. 54(B) certification, Hunt did not appeal that judgment. Rather, in December 1994, Hunt voluntarily dismissed the action and refiled it; the complaint reasserted the Pollards' claims against Domino's. On April 21, 1995, Domino's filed a motion to dismiss the claims against it. That motion was granted on May 10, 1995. On June 6, 1995, the Pollards wrote to Hunt, dismissing him as their attorney and requesting all files regarding the suit. Hunt gave the Pollards the files without keeping a copy.

{¶ 3} Hunt asserts that he then called OBLIC, his malpractice carrier, to alert the company to a potential claim regarding the matter. On August 7, 1996, the Pollards' new attorney sent correspondence to Hunt, notifying him of a malpractice complaint that had been filed in *Pollard v. Hunt*, Montgomery Case No. 96–CV–2376. Hunt neglected to forward a copy of the complaint against him, or to provide written notice of it, to OBLIC. In 1999, the Pollards voluntarily dismissed their action. They refiled their claim in March 2000. *Pollard v. Hunt*, Montgomery Case No. 00–CV–1553. OBLIC first received written notice of the Pollards' malpractice claim against Hunt when Hunt's attorney, John Smalley, wrote to OBLIC regarding the complaint on October 9, 2000. OBLIC ultimately denied coverage.

{¶ 4} On April 2, 2001, Hunt entered into a settlement agreement with the Pollards. Under the terms of this settlement, Hunt agreed to a judgment of $750,000; however, the agreement further provided that Hunt would pay only $4,000 and would assign his bad-faith claim against OBLIC to the Pollards in exchange for their agreement to satisfy the remainder of the judgment by

seeking a judgment against OBLIC instead of him. The trial judge subsequently approved the settlement and entered judgment against Hunt for $750,000.

{¶ 5} The Pollards then filed a supplemental complaint against OBLIC under R.C. 3929.06 to enforce the consent judgment and seeking damages for OBLIC's failure to defend and to indemnify Hunt against the malpractice claim brought by the Pollards. *Pollard v. Ohio Bar Liab. Ins. Co.,* Montgomery Case No. 00–CV–1553. The Pollards also asserted a bad-faith claim against the insurance company as Hunt's assignees. Meanwhile, OBLIC filed a separate action for declaratory judgment against Hunt and the Pollards. *Ohio Bar Liab. Ins. Co. v. Hunt,* Montgomery Case No. 00–CV–5154. Both the Pollards and OBLIC moved for summary judgment. The trial court granted OBLIC's motion and denied the Pollards' motion, finding that "[w]ritten notice was required, but not given and OBLIC was well within its rights to refuse coverage."

{¶ 6} In a consolidated appeal of both cases, the Pollards appealed the adverse summary-judgment ruling. Upon review, we concluded, in part, that the policy's notice provisions were ambiguous on the issue of whether oral notice of a malpractice claim (which Hunt claimed to have given to OBLIC) was sufficient and, thus, the trial court had erred by granting summary judgment to OBLIC. *Ohio Bar Liab. Ins. Co. v. Hunt,* 152 Ohio App.3d 224, 2003-Ohio-1381, 787 N.E.2d 82. We therefore reversed the grant of summary judgment and remanded the cause for further proceedings.

{¶ 7} Upon remand, the parties agreed to bifurcate the bad-faith and punitive-damages claims from the notice claim. On December 13, 2004, a jury trial began on the issue of whether Hunt had given oral notice of the Pollards' potential malpractice claim to OBLIC during the policy period, i.e., between June 7, 1994, and June 7, 1996. Two witnesses testified—Richard Hunt and Frederick Hunker, OBLIC's vice president of claims. During the presentation of testimony, the trial court repeatedly emphasized to the parties that the trial was concerned only with the issue of oral notice and not with the issues of Hunt's alleged malpractice, the settlement of the Pollards' malpractice claim against Hunt, collusion, or fraud. The jury found that the Pollards had not proven, by a preponderance of the evidence, that Hunt had telephoned OBLIC between June 7, 1994, and June 7, 1996. On March 10, 2005, the court entered judgment in favor of OBLIC, pursuant to the verdict.

{¶ 8} The Pollards raise one assignment of error on appeal.

{¶ 9} "The trial court erred by allowing OBLIC's counsel to argue to the jury during closing argument that the Pollards, their counsel and their key witness manufactured this case."

{¶ 10} In their sole assignment of error, the Pollards claim that OBLIC's counsel had presented improper closing argument. Specifically, the Pollards assert that OBLIC's counsel improperly argued that Hunt had a financial interest in the outcome of this action (*Pollard v. Ohio Bar Liab. Ins. Co.*); that the Pollards, their counsel, and Hunt had conspired to deceive the jury through perjured testimony; and that Hunt had perjured himself in order to support the Pollards' claim against OBLIC. The Pollards claim that the trial court's failure to intervene and to correct the prejudicial effect of this misconduct constitutes reversible error.

{¶ 11} In response, OBLIC argues that the jury verdict should be upheld because the Pollards failed to object to OBLIC's closing argument, OBLIC's closing argument did not rise to the level of plain error, and the jury was properly instructed that closing arguments are not evidence. OBLIC asserts that its closing argument was permissible because it was based on reasonable inferences from the evidence.

{¶ 12} Generally, trial counsel is entitled to considerable latitude in the presentation of closing argument. *Pang v. Minch* (1990), 53 Ohio St.3d 186, 559 N.E.2d 1313, paragraph two of the syllabus. The Supreme Court of Ohio has recognized, however, that abusive remarks and tactics can undermine the fairness of the trial, and that the trial judge has a duty "to see that counsel do not create an atmosphere which is surcharged with passion or prejudice and in which the fair and impartial administration of justice cannot be accomplished." *Pesek v. Univ. Neurologists Assn., Inc.* (2000), 87 Ohio St.3d 495, 721 N.E.2d 1011; see *Fehrenbach v. O'Malley,* Hamilton App. No. C–040128, 2005-Ohio-5554, 2005 WL 2679606. "When argument spills into disparagement not based on any evidence, it is improper." *Clark v. Doe* (1997), 119 Ohio App.3d 296, 307, 695 N.E.2d 276.

{¶ 13} Ordinarily, in order to support a reversal of a judgment based on improper closing argument to the jury, it is necessary that counsel interject a proper and timely objection to the claimed improper remarks so that the court may take proper action thereon. *Snyder v. Stanford* (1968), 15 Ohio St.2d 31, 44 O.O.2d 18, 238 N.E.2d 563, paragraph one of the syllabus; *Villella v. Waikem Motors, Inc.* (1989), 45 Ohio St.3d 36, 40, 543 N.E.2d 464. Thus, the determination of whether remarks made during closing argument exceeded the bounds of permissible argument is a discretionary function to be performed, in the first instance, by the trial court. *Pang,* supra, at paragraph three of the syllabus. The trial court's determination is reviewed for an abuse of discretion. Id.

{¶ 14} However, " '[w]here gross and abusive conduct occurs, the trial court is bound, sua sponte, to correct the prejudicial effect of counsel's misconduct.' " (Emphasis omitted.) *Pesek,* 87 Ohio St.3d at 501, 721 N.E.2d 1011,

quoting *Snyder*, 15 Ohio St.2d at 37, 44 O.O.2d 18, 238 N.E.2d 563. If "'there is room for doubt, whether the verdict was rendered upon the evidence, or may have been influenced by improper remarks of counsel, that doubt should be resolved in favor of the defeated party.'" Id. at 502, 721 N.E.2d 1011, quoting *Warder, Bushnell & Glessner Co. v. Jacobs* (1898), 58 Ohio St. 77, 85, 50 N.E. 97.

{¶ 15} First, the Pollards argue that OBLIC's counsel improperly implied that Hunt had a financial interest in the outcome of the trial, despite the fact that the evidence indicated that the settlement eliminated Hunt's financial interest in the litigation. OBLIC's counsel argued:

{¶ 16} "The first thing I want to talk to you about is the discussion that we've had in this courtroom. You remember Mr. Hunt when he was on the stand, he was asked a question by other counsel whether he had any financial interest in this case and he said no. Well, that was partially true. Just think about it now because I'm going to take you through this.

{¶ 17} "That was a half truth; * * * After he said that he didn't have a financial interest, he cut a deal with the Pollards to get out the case, out of the case in which he and his firm were the defendants so that they [the Pollards] could prosecute this case.

{¶ 18} "What did he get out of the deal? Number one, he has a financial interest and there's no question about it.

{¶ 19} " * * *

{¶ 20} "Let's go back and talk about that. Go back and talk about who actually has an interest in this case. Who has an interest to get out of a jam? And he was in a jam. * * * "

{¶ 21} Upon review, we agree with OBLIC that its counsel's suggestions that Hunt's financial interest in the litigation might have affected his credibility was proper. Although Hunt initially testified that he had no financial stake in the outcome of the litigation, he subsequently acknowledged on re-cross-examination that he had been exposed financially prior to signing the agreement. Thus, OBLIC cannot be faulted for calling Hunt's initial testimony a "half-truth" and pointing out that Hunt had had a financial interest, which was eliminated by the settlement.

{¶ 22} OBLIC argues that "Hunt's convenient and sudden recollections about making a phone call during the time at issue surfaced after the settlement, which released Hunt as a part-defendant. * * * Hence, a 'reasonable inference' could be made that Hunt's memories were mistaken and/or influenced by his financial interest in being dismissed from a malpractice lawsuit." Although the Pollards certainly could have argued that the settlement removed any bias due to a

financial interest on Hunt's part, it was not unreasonable for OBLIC to assert that Hunt's memory could have been affected by a desire to enter into the settlement. It is at least arguable that his recollections regarding oral notice might have been affected by his desire to enter into a realizable settlement.

{¶ 23} Second, the Pollards contest OBLIC's counsel's reference to the Pollards' wanting to "jive and dance" and his statement that "somebody should not be allowed to pawn something like this on the bad insurance company because it's an outrage." Upon review of the argument as a whole, it is apparent that these statements were displays of showmanship. However, they were not "so egregious and prejudicial that the trial court abused its discretion by failing to admonish counsel and take curative action." *Pesek,* 87 Ohio St.3d at 503, 721 N.E.2d 1011.

{¶ 24} Next, the Pollards assert that OBLIC's counsel improperly argued to the jury that Hunt had lied when he testified that he contacted OBLIC during the policy period. During closing argument, OBLIC's counsel initially stated, "[A]m I standing here calling Dick Hunt a liar? No." However, its counsel subsequently stated that he could not "break down Mr. Hunt and have him withdraw" his statements and that he could not "bang him [Hunt] over the head and say, [T]ell the truth." Such statements clearly suggest that Hunt had knowingly testified falsely regarding whether he had given oral notice to OBLIC during the policy period. Although counsel may not make unwarranted attacks on a witness's character, it is not improper to characterize a witness as a liar or a claim as a lie if the evidence reasonably supports the characterization. See *State v. Baker,* 159 Ohio App.3d 462, 2005-Ohio-45, 824 N.E.2d 162, ¶ 19.

{¶ 25} In this case, there was substantial evidence from which OBLIC could argue that Hunt was not credible and, in fact, had lied about contacting OBLIC regarding the Pollards' claims. Upon review of the record, OBLIC presented a strong case that Hunt had failed to provide oral notice to OBLIC between June 7, 1994, and June 7, 1996. Hunker testified that OBLIC had never received any notice of the Pollard claim during the policy period. He indicated that he and Gretchen Koehler–Mote handled claims and that neither was aware of a report of the Pollard claim prior to Smalley's written notice. Hunker's investigation, including research into telephone records, database, and other malpractice-claim files, failed to reveal evidence that Hunt had orally reported the claim between June 7, 1994, and June 7, 1996.

{¶ 26} In addition, OBLIC elicited substantial evidence that Hunt's testimony was not credible. He testified that although he had called OBLIC about the Pollards, he could not recall "who [he] spoke to or what was said or the time that [he] made the phone call. [His] recollection was June or July, but that was years

afterwards." Hunt further testified on cross-examination that he "didn't feel that the fact that the judge was right about having gotten Domino's out of the case was the kind of thing that [he] had to report to [his] malpractice insurance carrier." Hunt testified that he did not feel that he had done anything wrong in connection with his representation of the Pollards.

{¶ 27} As for the telephone call, OBLIC's telephone log for its toll-free line showed a telephone call to OBLIC from Hunt's office on May 23, 1995; the call lasted 1.8 minutes. Hunt testified that he did not know who had placed the May 23, 1995 call, and that the call could have been made by a secretary or another lawyer within the firm. There was no record of a call in June or July of 1995. OBLIC never provided a written acknowledgment of the alleged 1995 call regarding the Pollards, and no one from OBLIC contacted Hunt about the case or his actions. Although OBLIC did not have a telephone log for calls into the 614–area–code line, the Pollards did not provide any of Hunt's telephone records to support their assertion that a call had been made to that line in June or July of 1995.

{¶ 28} Two days after the May 23, 1995 telephone call, a renewal application was sent to the firm to renew the malpractice insurance. The law firm's June 13, 1995 renewal application to OBLIC indicated that the firm did not know of any circumstance, act, or omission which could result in a professional-liability claim. In June 1995, Hunt transferred his files to the Pollards without keeping a copy of them. He indicated that he would have kept a copy of his file if he felt that he had made a mistake and needed to protect himself. In sum, OBLIC had substantial grounds to attack Hunt's credibility based on the chronology of events and could reasonably argue that Hunt had lied.

{¶ 29} Finally, the Pollards complain that OBLIC's counsel improperly asserted that Hunt, the Pollards, and the Pollards' counsel had colluded to manufacture a viable claim against OBLIC. During closing argument, OBLIC's counsel asserted that the Pollards had settled with Hunt so that they could proceed against OBLIC and that Hunt needed to ensure that the Pollards had a claim in order to benefit from the settlement. OBLIC's counsel stated, "They had to come up somehow in some way with a claim by the Pollards against OBLIC. The only way they could do that is the bogus—to boogie up the idea that Hunt made a call in June or July of 1995." To clarify, OBLIC's counsel indicated that the Pollards' counsel presented Hunt with a second affidavit (after Hunt had previously provided an affidavit for OBLIC indicating that he had provided notice sometime before October 2000), which indicated that he had given oral notice in June or July of 1995, i.e., within the policy period. Specifically, OBLIC's counsel argued:

{¶ 30} "This is not a case where OBLIC made a mistake and is trying to cover up for its mistake. This is a case where Mr. Hunt either made a mistake—I'll give him the benefit of the doubt—*or in order to get his deal to get him dismissed from the case that was pending against him, agreed to say certain things; and how in the world do you prove that other than with circumstantial evidence?*

{¶ 31} "What was the reason that the Pollards cut a deal with Hunt with the attorneys sitting here? So that Hunt, the alleged person who did something wrong—although he didn't think so—so they can proceed against OBLIC in this case. What was the reason? Well, they have to come up somehow—follow this. *They had to come up somehow in some way with a claim by the Pollards against OBLIC. The only way they could do that is the bogus—to boogie up the idea that Hunt made a call in June or July of 1995. Just follow it along.*

{¶ 32} " * * *

{¶ 33} "The record is clean and clear of no notice by Hunt during the policy period of 6/7/94 to 6/7/96. Now we're all the way, there's nothing up to that time. Now we're all the way down to 2001. * * * Now we're involved in litigation with the Pollards so then the affidavits start coming. *And start, Hunt starts the embellishment which brings us to you, ladies and gentleman of the jury, for decision; and by embellishment, what I'm talking about, I mean, when we went to Hunt after there was a deposition—and there were depositions before this, where people give statements under oath. Then we try to present the issue to the court. That was how these affidavits were generated.*

{¶ 34} "So the first affidavit you see, remember April. The assignment was April of '01. Never before was there anything in the record about the issues you are trying to answer today. Never, nothing. So finally once we get sued, we get into discovery. The best Hunt can do on December 19 of 2001, remember he's got off the notice, he does this. *Pollards have no claims because it is not within the policy period, the period we're talking about. He's got to do this if the Pollards can go forward. In other words, for him to be out.* He says sometime prior to October of 2000. Now, that's not what he told you in court, is it?

{¶ 35} "He says at that time, sometime prior to 2000, I informed Ohio Bar Liability Insurance Company of the Pollard claim. Well, as far as we're concerned, this information is new to us. This is new, but it's not good enough. *It's not good enough for the Pollards. Just follow me. It's not good enough for the Pollards because it has to be more specific. The notice has to be, remember, within the policy periods of June '94 to June '96. So this doesn't do it.*

{¶ 36} "We get this affidavit. Sure enough, we [OBLIC] get this affidavit. We don't have any problem with the affidavit. We, this is nonsense here but what

happens? *Then the Thomas firm has Hunt sign another affidavit. Look what happens. Look what happens. At some point in June or July of 1995, it's a miracle, folks. Now we're in the policy period. It's a miracle. Sometime, at some point in June or July, I became aware of a potential claim for a legal malpractice claim being made against me. What is he talking about?"* (Emphasis added.)

{¶ 37} In our judgment, OBLIC's counsel's comments were within the bounds of permissible closing argument. Although OBLIC's counsel created the impression that Hunt had agreed to state that he had contacted OBLIC within the policy period in order for the Pollards to be able to pursue their claim against the insurance company, this was a permissible inference in light of the evidence. For purposes of showing bias or attacking Hunt's credibility, the trial court permitted testimony that Hunt and the Pollards entered into a settlement agreement and that part of that settlement was that Hunt would assign any interest he had in the policy with OBLIC to the Pollards. Although the jury was not permitted to learn that Hunt had agreed to a judgment of $750,000 or that Hunt was required to satisfy only $4,000 of that amount, it was reasonable for OBLIC to argue that the settlement may have had an impact on Hunt's testimony. In particular, we believe that OBLIC reasonably could argue that in order for the assignment to have value, the Pollards needed to have notice within the policy period. Moreover, it was permissible for OBLIC to note that Hunt's evidence in support of that notice got more favorable when he signed the second affidavit, which was presented to him by the Pollards' attorney. In reaching our determination, we recognize that OBLIC's counsel skirted the line between acceptable closing argument and disparagement of opposing counsel. However, reading the closing argument as a whole, we do not conclude that OBLIC's argument went beyond acceptable closing argument and warrants reversal.

{¶ 38} The assignment of error is overruled.

{¶ 39} The judgment of the trial court will be affirmed.

Judgment affirmed.

FAIN and YOUNG, JJ., concur.

FREDERICK N. YOUNG, J., retired, of the Second Appellate District, sitting by assignment.